01

02

03

04

05

06 UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
07 AT SEATTLE

08 TAMMY MANOR,                                    )
                                                   )   CASE NO. C10-5944-JLR
09        Plaintiff,                               )
                                                   )
10        v.                                        )   REPORT AND RECOMMENDATION
                                                   )   RE: SOCIAL SECURITY DISABILITY
11 MICHAEL J. ASTRUE, Commissioner                  )   APPEAL
   of Social Security,                             )
12                                                  )
          Defendant.                               )
13 _____        )

14        Plaintiff Tammy Manor proceeds through counsel in her appeal of a final decision of the

15 Commissioner of the Social Security Administration (Commissioner).   The Commissioner

16 denied plaintiff's applications for Supplemental Security Income (SSI) and Disability

17 Insurance Benefits (DIB) after a hearing before an Administrative Law Judge (ALJ).

18                         FACTS AND PROCEDURAL HISTORY

19        Plaintiff was born on XXXX, 1970.[1]   She dropped out of high school in the eleventh

20 grade, obtained a GED, and attended one semester of community college.   (AR 55, 368.)   She

21 _____

22        [1] Plaintiff's date of birth is redacted back to the year of birth in accordance with Federal Civil
   Procedure 5.2(a) and the General Order of the Court regarding Public Access to Electronic Case Files,
   pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

01  previously worked as a cleaner, driver, cook, and food service manager.   (AR 210.)

02  Plaintiff filed applications for DIB and SSI in March 2007, alleging disability beginning

03  June 1, 2006, based on chronic neck, back, and shoulder pain resulting from a car accident in

04  2001, as well as post-traumatic stress disorder (PTSD), depression, high blood pressure, cysts,

05  digestive problems, night terrors, right ear hearing difficulties, and memory problems.   (AR

06  199.)   Her applications were denied at the initial level and on reconsideration, and she timely

07  requested a hearing.

08  ALJ Marguerite Schellentrager held a hearing on April 5, 2010, taking testimony from

09  plaintiff, vocational expert (VE) Steve Duchene, and lay witness Kristine Southard.   (AR

10  31-78.)   On May 11, 2010, the ALJ issued a decision finding plaintiff not disabled.   (AR

11  10-23.)

12  Plaintiff timely appealed.   The Appeals Council denied plaintiff's request for review

13  on November 9, 2010 (AR 1-3), making the ALJ's decision the final decision of the

14  Commissioner.   Plaintiff appealed this final decision of the Commissioner to this Court.

15                                            DISCUSSION

16  The Commissioner follows a five-step sequential evaluation process for determining

17  whether a claimant is disabled.   *See* 20 C.F.R. §§ 404.1520, 416.920 (2000).   At step one, it

18  must be determined whether the claimant is gainfully employed.   The ALJ found plaintiff had

19  not engaged in substantial gainful activity since the alleged onset date.   (AR 12.)

20  At step two, it must be determined whether a claimant suffers from a severe impairment.

21  The ALJ found that plaintiff has the following severe impairments: lumbar fusion; carpal tunnel

22  syndrome, bilateral; uterine fibroids; depression; PTSD; panic disorder and polysubstance

01  abuse.  (*Id.*)

02      Step three asks whether a claimant's impairments meet or equal a listed impairment.

03  The ALJ concluded that plaintiff did not have an impairment or combination of impairments

04  that met or medically equaled a listing.  (AR 14-15.)

05      If a claimant's impairments do not meet or equal a listing, the Commissioner must

06  assess residual functional capacity (RFC) and determine at step four whether the claimant has

07  demonstrated an inability to perform past relevant work.   The ALJ found plaintiff capable of

08  performing sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), except that

09  she should avoid any reaching with the right arm above the shoulder and should only work with

10  things and not people.  (AR 15-21.)   With this RFC, the ALJ found plaintiff unable to perform

11  her past relevant work.   (AR 21.)

12      If a claimant demonstrates an inability to perform past relevant work, the burden shifts

13  to the Commissioner to demonstrate at step five that the claimant retains the capacity to make

14  an adjustment to work that exists in significant levels in the national economy.   With the

15  assistance of the VE and consideration of the Medical-Vocational Guidelines, the ALJ found

16  plaintiff able to perform other jobs, such as assembler or bonder.   (AR 22.)

17      This Court's review of the ALJ's decision is limited to whether the decision is in

18  accordance with the law and the findings are supported by substantial evidence in the record as

19  a whole.  *See Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993).   Substantial evidence means

20  more than a scintilla, but less than a preponderance; it means such relevant evidence as a

21  reasonable mind might accept as adequate to support a conclusion.  *Magallanes v. Bowen*, 881

22  F.2d 747, 750 (9th Cir. 1989).   If there is more than one rational interpretation, one of which

01 supports the ALJ's decision, the Court must uphold that decision. *Thomas v. Barnhart*, 278

02 F.3d 947, 954 (9th Cir. 2002).

03       Plaintiff argues that the ALJ erred in (1) relying on the Cooperative Disability

04 Investigations Unit (CDIU) report in violation of plaintiff's due process rights; (2) evaluating

05 plaintiff's testimony; (3) evaluating the medical source opinions; (4) evaluating Ms. Southard's

06 lay witness testimony; and (5) failing to develop the record further with respect to plaintiff's

07 alleged mental impairments.   Plaintiff requests remand for further administrative proceedings.

08 The Commissioner argues that the ALJ's decision is supported by substantial evidence and

09 should be affirmed.

10 Due Process Rights

11       In August 2007, Detectives Monteer and Liburdi from the CDIU conducted an

12 investigation to resolve inconsistencies in reported functioning, daily activities, and limitations

13 in plaintiff's claim as reported by the Disability Determinations Services office.   (AR 779.)

14 The detectives interviewed the manager of the trailer park where plaintiff resides with her life

15 partner, Kristine Southard, as well as a neighbor in the trailer park.   (AR 781-83.)

16       The CDIU report describes the interview with the manager as follows:

17     The manager described MANOR and Southard as manipulating and always
looking for someone to file a law suit against.   Monteer asked about MANOR's
18     ability to function, to which the manager replied MANOR is addicted to pain
killers.   The manager told Monteer that MANOR and Southard ride on a
19     motorcycle together and she has seen them in the past month doing this.

20     The manager also told Monteer that MANOR and Southard take their motor
boat out and have done it several times this year.   According to the manager,
21     she has seen both MANOR and Southard participating in hooking up the boat
for towing.   The manager has also seen MANOR driving a motor vehicle,
22     which she does often.

01  (AR 781-82.)   The CDIU report describes the detectives' interview with plaintiff's neighbor as

02  follows:

03      Monteer then spoke to a neighbor and learned that this neighbor had information
        about MANOR having back surgery approximately five years ago.   This
04      neighbor told Monteer that MANOR and her girl friend have called the police on
        a neighbor and claimed that he was a peeping Tom even though it was not true.
05      Monteer asked why they would do something like that, the neighbor told
        Monteer that they (MANOR and Southard) did not like the guy and he
06      eventually moved.   This neighbor also told Monteer that they (MANOR and
        Southard) poisoned plants of a neighbor and caused damage to another
07      neighbor's trailer by pulling parts of the molding off.   This neighbor told
        Monteer that MANOR and Southard are mean people and she fears them.
08
        The neighbor was aware that MANOR takes up to 18 pain killer pills a day.
09      Monteer asked about MANOR's ability to understand things and her overall
        appearance.   The neighbor told Monteer that MANOR is very sharp and does
10      not miss a thing.

11      Monteer also learned from this neighbor that MANOR and Southard took their
        boat out a couple of weeks ago.   Monteer learned that they both were involved
12      with hitching and unhitching the boat.   The neighbor described MANOR's
        movements in terms of agility as normal.

13

14  (AR 782.)

15      The detectives then employed a ruse to engage Ms. Southard in a telephone

16  conversation in which "[s]he told Monteer that MANOR and her work two days a week at

17  Tacoma Foot and Ankle [Clinic]."   (*Id.*)   Continuing the ruse, the detectives arranged to meet

18  plaintiff and Ms. Southard at the clinic the next day.   (*Id.*)   The CDIU report describes that

19  meeting as follows:

20      At approximately 10:25 a.m., Monteer observed MANOR driving the blue
        Toyota 4 Runner, she turned into the complex.   Monteer notified Detective
21      Liburdi who was on foot inside the complex.

22      Liburdi was able to observe MANOR park the vehicle in the complex.   She

01 then exited the vehicle without any problems, carrying a purse and other items in
her hands. She displayed no outward signs of discomfort. MANOR was
02 dressed in a nurse outfit. Southard (who was also wearing a nurse's outfit) was
observed exiting the front passenger seat, reached into the back and retrieved a
03 walker that she set up for an elderly lady who was exiting the right rear
passenger seat. Both Southard and MANOR assisted this elderly woman into
04 the Foot and Ankle office. The distance from the vehicle to the office was
approximately 25 yards.
05
Several minutes later Monteer contacted the Tacoma Foot and Ankle office and
06 employed the same ruse. Monteer observed both women wearing nurse outfits,
MANOR was wearing a darker blue suit and Southard's was light blue.
07 MANOR introduced herself to Monteer, she was smiling and very friendly, she
had make-up on and her hair was neatly arranged. Monteer presented several
08 photos to MANOR who was standing. She peered at them intently and told
Monteer that she recognized one of them. Monteer asked her what was the
09 name of the individual and she read the name to Monteer. She also read the
address associated with the photo. Monteer asked her if she was sure about the
10 picture and she told Monteer that she has a good memory. Southard confirmed
this by telling Monteer that MANOR has, "A great memory."
11
Monteer learned from MANOR that her and Southard assist at the office two
12 days a week and help with answering phones, filing, and patient assistance with
obtaining preliminary information regarding their injuries and sometimes help
13 patients with sitting and standing.
14 Both detectives observed that MANOR exhibited no physical difficulties or
limitations whatsoever. MANOR was pleasant and cooperative and was able to
15 follow the conversation and respond without hesitation.

16 (AR 782-83.)

17      Plaintiff argues that the Commissioner's reliance on the CDIU investigation in this case

18 fails to satisfy the procedural due process protections required. She states that the detectives

19 made a number of errors in their investigation: no effort was made to collect objective evidence

20 such as recordings or pictures of the event; to contact the managers or other employees at the

21 clinic to confirm that plaintiff worked there; or to obtain first-hand descriptions from the

22 neighbor and manager at the trailer park. Plaintiff further argues that she was given no

01  opportunity to confront these witnesses and this report would not have been admissible in any

02  other judicial forum.  (*Id*.)  Plaintiff asserts that due process protections apply in the context

03  of Social Security administrative hearings.  *Mathews v. Eldridge*, 424 U.S. 319 (1976); *Bayliss*

04  *v. Barnhart*, 427 F.3d 1211 (9th Cir. 2005).

05          Plaintiff points to the three-step balancing test articulated in *Mathews*, 424 U.S. at

06  334-35, requiring the Court to consider: (1) the interest at issue; (2) the risk of erroneous

07  deprivation through the procedures used and the probative value of additional procedural

08  safeguards; and (3) the government's interest.  However, the *Mathews* Court addressed and

09  confirmed an individual's statutorily recognized "property interest" in continued receipt of

10  Social Security benefits once they have been awarded.  *Id*. at 332.  In other words, it is the

11  termination of that property interest which implicates due process.  *Id*.  Plaintiff's reliance on

12  *Mathews*, therefore, is misplaced.

13          Plaintiff otherwise relies on the Ninth Circuit's decision in *Bayliss* in arguing that the

14  ALJ's reliance on the CDIU report rendered the proceedings fundamentally unfair.  To

15  succeed in such a claim, plaintiff must show that "the ALJ's behavior, in the context of the

16  whole case, 'was so extreme as to display clear inability to render fair judgment.'"  *Bayliss*,

17  427 F.3d at 1214-15 (quoting *Liteky v. United States,* 510 U.S. 540, 551 (1994)).

18          In evaluating plaintiff's *Bayliss* claim, the Court begins with a presumption that the ALJ

19  was unbiased.  *Id*. (citing *Schweiker v. McClure,* 456 U.S. 188, 195 (1982)).  Plaintiff can

20  rebut this presumption by showing a "'conflict of interest or some other specific reason for

21  disqualification.'"  *Id.* (quoting *Schweiker*, 456 U.S. at 195).  However, the Court is free to

22  reject allegations "that due process was violated when isolated parts of an ALJ's conduct were

01 challenged but the record as a whole showed fundamental fairness for the litigants." *Id*. at

02 1215-16.

03        The ALJ relied, in part, on the CDIU report in finding plaintiff not credible.   (AR 18.)

04 The ALJ additionally limited the weight given to the opinions of the Department of Social and

05 Health Services (DSHS) examiners, in part, because of "the significant reliance they appeared

06 to have placed upon the subjective allegations of an individual with documented credibility

07 issues[.]"   (AR 19.)   The ALJ also limited the weight given to Dr. Brian Esparza's opinion, in

08 part, because it "appeared to be influenced by the self reports of the claimant[.]"   (*Id*.)

09        Plaintiff had ample opportunity to challenge the CDIU report, and did, in fact, challenge

10 it twice.   (AR 34-35, 278-82.)   At the hearing with the ALJ, plaintiff's attorney objected to the

11 admissibility of the CDIU report.   (AR 34.)   The ALJ responded as follows:

12        I will consider your objection.   I have reviewed that.   The fact that it may or
       may not be hearsay goes to the weight that I will give it and I will keep it in the
13       record and ask some questions about it, about some of the things in there to give
       your client an opportunity to help me understand some of that.

14

15 (AR 35.)   The ALJ proceeded to question plaintiff about numerous issues addressed in the

16 CDIU report, including her use of prescription drugs, her experiences riding on a motorcycle

17 and boat, and her alleged employment at the Foot and Ankle Clinic.   (AR 40-43.)   Plaintiff

18 was also given an opportunity to respond to questions from her attorney.   (AR 45-64.)

19        Six days after the hearing, but nearly a month prior to the ALJ's decision, plaintiff

20 submitted a letter to the ALJ further objecting to any use of the CDIU report.   (AR 278-82.)

21 She also submitted a declaration specifically refuting the allegations contained in the report and

22 providing innocent explanations for the observations by the investigators.   (*Id*.)

01    Plaintiff does not explicitly argue the ALJ is biased, but does state that "[t]he

02  Commissioner's blind reliance on this report at all levels of review robbed the disability review

03  process of any semblance of fundamental fairness and violated plaintiff's due process rights."

04  (Dkt. 15 at 8.)   Plaintiff points to no conflict of interest that would bias the ALJ's decision.

05  The only specific reason for disqualification arguably raised by plaintiff came in her reply brief

06  where she stated, "[i]n the decision, the ALJ made no effort to address Plaintiff's objections or

07  Declaration refuting the report, beyond noting that [the CDIU report] could not be ignored."

08  (Dkt. 17 at 3.)

09    The ALJ properly considered the CDIU report as evidence.   *See* 42 U.S.C. § 405(b)(1);

10  *Richardson v. Perales,* 402 U.S. 389, 400 (1971) ("strict rules of evidence, applicable in the

11  courtroom, are not to operate at social security hearings so as to bar the admission of evidence

12  otherwise pertinent").   This consideration does not establish bias, as evidenced by a number of

13  recent cases.   *See, e.g., Robert v. Astrue*, 688 F. Supp. 2d 29, 37 (D. Mass. 2010) (CDIU report

14  "provides ample support for the ALJ's decision denying benefits"); *Knox v. Astrue,* 660 F.

15  Supp. 2d 790, 800 (S.D. Tex. 2009) (remanding, in part, because the CDIU report was

16  insufficient to support the ALJ's decision); *Zargi v. Comm'r of Soc. Sec.,* No. CIV

17  S-08-1677-CMK, 2009 WL 1505311, at *3 (E.D. Cal. May 27, 2009) (ALJ relied, in part, on

18  CDIU report in discrediting plaintiff and rejecting the opinions of two examining physicians).

19  Plaintiff has cited to no case, nor has this Court found one, in which the ALJ's reliance on a

20  CDIU report supported a finding that plaintiff's due process rights were violated.

21    Furthermore, plaintiff failed to take advantage of additional procedural safeguards.

22  Plaintiff had a qualified regulatory right to request the presence of the detectives at the

disability hearing for purposes of cross-examination, but failed to make this request. 20 C.F.R.

§ 404.950(d)(1) ("When it is reasonably necessary for the full presentation of a case, an

administrative law judge or a member of the Appeals Council may, on his or her own initiative

or at the request of a party, issue subpoenas for the appearance and testimony of witnesses and

for the production of books, records, correspondence, papers, or other documents that are

material to an issue at the hearing."). Alternatively, plaintiff could have submitted

interrogatories to the detectives to challenge the basis for their findings, but also failed to do so.

*See Solis v. Schweiker*, 719 F.2d 301, 302 (9th Cir. 1983) ("interrogatories can adequately

replace in-court testimony where factual questions such as foundation or expertise are at

issue").

Plaintiff fails to demonstrate error in the ALJ's reliance on the CDIU report. *See, e.g.,*

*Robert*, 688 F. Supp. 2d at 38 ("to the extent a report provides factual rather than interpretive

data, and to the extent the administrative law judge provides the claimant with an opportunity to

address the report…the report may be given appropriate weight based on all the

circumstances"). The ALJ did not rely solely on the CDIU report at any stage of her analysis.

Furthermore, the record as a whole showed fundamental fairness for plaintiff. *Bayliss*, 427

F.3d at 1215-16.

## Credibility

Absent evidence of malingering, an ALJ must provide clear and convincing reasons to

reject a claimant's testimony. *See Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001); s*ee*

*also Thomas*, 278 F.3d at 958-59. In finding a social security claimant's testimony unreliable,

an ALJ must render a credibility determination with sufficiently specific findings, supported by

01  substantial evidence.  "General findings are insufficient; rather, the ALJ must identify what

02  testimony is not credible and what evidence undermines the claimant's complaints."  *Lester v.*

03  *Chater*, 81 F.3d 821, 834 (9th Cir. 1996).   "We require the ALJ to build an accurate and logical

04  bridge from the evidence to her conclusions so that we may afford the claimant meaningful

05  review of the SSA's ultimate findings."  *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003).

06  "In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness,

07  inconsistencies either in his testimony or between his testimony and his conduct, his daily

08  activities, his work record, and testimony from physicians and third parties concerning the

09  nature, severity, and effect of the symptoms of which he complains."  *Light v. Soc. Sec.*

10  *Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

11      The ALJ found plaintiff's statements concerning the intensity, persistence, and limiting

12  effects of her symptoms not credible to the extent inconsistent with the RFC assessment,

13  providing the following reasoning:

14      Along the line of third party opinion, the undersigned could not ignore the
        Cooperative Disability Investigations Unit Report from August 2007.  At that
15      time, the claimant was observed to exhibit no physical difficulties or limitations
        by Detective Brian Monteer and his associate.  Both, the claimant and Ms.
16      Southard [were] pleasant, cooperative, wearing nurse style outfits.  The
        claimant was also observed to have worn make-up and [drove] a car.  The
17      claimant and her significant other, Ms. Southard represented they were
        employees of the Foot and Ankle Clinic.  Ms. Southard at hearing testified she
18      worked there; whereas the claimant denied she worked there.  Detective
        Monteer interviewed collateral witnesses and Ms. Southard described the
19      claimant as having a "great memory."  The report conclusion was reason to
        believe the claimant knowingly provided false information based on a
20      preponderance of the evidence standard.  At that time, the claimant's opinion
        about her symptoms [was] disregarded along with reports from St. Peters
21      Hospital, Greater Lakes Mental Health, Sound Medical Group and Community
        Health because they too were based on input from the claimant; a discredited
22      source.  The investigative report also noted Ms. Southard was purportedly

01    receiving disability for being severely disabled.

02    After careful consideration of the objective evidence, together with the opinion
      or statements by third parties, such as Kristin[e] Southard, Detective Monteer
03    and Stephen Schmidt, the undersigned finds that the claimant's medically
      determinable impairments may allegedly cause the alleged symptoms.
04    However, the claimant's statements concerning the intensity, persistence and
      limiting effects of these symptoms are not credible to the extent they are
05    inconsistent with the above residual functional capacity assessment.   The
      evidence showed the claimant had back and/or neck surgeries, including fusions
06    and that she remained on morphine to this day.   The claimant testified she is
      able to lift her right arm to shoulder level and no higher.   Yet, there are no
07    objective tests or findings within the record evidence to support her neck and
      back complaints.   Yet, she had been repeatedly limited to the sedentary
08    exertional level with some limitations pertaining to her right scapula.   The
      undersigned has conceded this is a severe impairment.   Nevertheless, there are
09    also records in evidence that describe extensive activities the claimant
      participated in and continued to deny.   As for the claimant's mental health
10    conditions, there are no objective tests in (i.e., MMPI, Trail Making, etc)
      evidence to evaluate the claimant's underlying credibility.   The claimant's
11    credibility is questionable because of the report of her claim pursuits contradict
      her disability [claims].   She appeared motivated by secondary gain.

12
      The medical records confirm the following, all of which was denied by the
13    claimant at the hearing: that she has filed lawsuits against former employers and
      doctors, that she has filed a claim with Labor & Industries, that she has engaged
14    in narcotics seeking behavior.   Medical records also confirm her engaging in
      activities such as: learning to ride a motorcycle in 2004, running in March 2007.
15    These facts in light of the claimant's insistent denial, convince me that the
      claimant is motivated by secondary gain and is not credible.

16

17    (AR 17-18; internal citations omitted.)

18        Plaintiff and the Commissioner agree that the record does not support the ALJ's

19    conclusion of secondary gain motivation.   The parties also agree that substantial evidence does

20    not support the ALJ's conclusion that plaintiff engaged in narcotics seeking behavior.   The

21    parties further agree that evidence of plaintiff riding a motorcycle in 2004 does not constitute a

22    clear and convincing reason for discrediting her, given that her alleged disability began in June

01  2006.  However, the Commissioner argues that "the ALJ's remaining reasons – plaintiff's

02  activities and the medical evidence – sufficiently support the ALJ's credibility finding."  (Dkt.

03  16 at 9.)

04       Plaintiff takes issue with the ALJ's use of inconsistencies in the CDIU report as the

05  basis for disbelieving her subjective complaints.  Plaintiff notes that the detectives only

06  "observed Plaintiff for a very brief period of time at the Clinic," and "[t]heir observations did

07  not include Plaintiff actually working or involved in any activity that would have exacerbated

08  her physical or mental conditions."  (Dkt. 15 at 7.)   Plaintiff also points out that the detectives

09  could have requested employment verification from the Clinic, but did not.

10       Plaintiff next criticizes the ALJ's observation that the medical records confirm that she

11  was running when she hurt her knee in March 2007.  She argues that the medical report is

12  consistent with her testimony that she was at her niece's soccer game and tripped while walking

13  across the field.

14       Plaintiff also takes issue with the ALJ's contention that objective medical findings do

15  not support her neck and back complaints.   Plaintiff argues that testimony regarding pain may

16  not be disregarded simply for a lack of objective findings if a plaintiff has presented evidence of

17  an impairment that could reasonably produce pain.  *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th

18  Cir. 1996).  Plaintiff points to evidence of impairments such as her lumbar and cervical

19  fusions, a bulging disc above the fused vertebrae, and winging of her scapula.   She argues that

20  these impairments could reasonably have caused her pain.   The Commissioner admits the ALJ

21  imprecisely stated that no objective tests or findings supported plaintiff's neck and back

22  complaints.   However, the Commissioner argues that reviewing the ALJ's entire decision in

01 context shows the medical evidence contradicted plaintiff's testimony to the extent she alleged

02 having disabling limitations.

03       Despite the errors in the ALJ's credibility assessment, there is still substantial evidence

04 to support her determination. *Carmickle v. Commissioner, Soc. Sec. Admin.*, 533 F.3d 1155,

05 1162-63 (9th Cir. 2008) (where the ALJ provides specific reasons supporting an assessment and

06 substantial evidence supports the conclusion, an error in the assessment may be deemed

07 harmless; the relevant inquiry "is not whether the ALJ would have made a different decision

08 absent any error, . . . [but] whether the ALJ's decision remains legally valid, despite such

09 error.") (citing *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195-97 (9th Cir. 2004)).

10 An ALJ appropriately considers inconsistencies or contradictions between a claimant's

11 statements and her activities of daily living. *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th

12 Cir. 2001); *Thomas*, 278 F.3d at 958-59. The ALJ, elsewhere in the decision, appropriately

13 identified discrepancies in plaintiff's testimony regarding the severity of her impairments.

14 (*See* AR 13-17.) For example, plaintiff testified that she was limited to lifting a glass of water

15 or a plate with her right hand. (AR 52.) However, she also testified that she could use a Wii

16 video game controller, fold laundry, and start doing the dishes. (AR 51, 56.) In addition, the

17 ALJ noted that plaintiff was able to carry a suitcase through an airport and admitted to

18 travelling by airplane to California to visit family. (AR 13, 864.) Plaintiff also testified that

19 she was not running in March of 2007 when she sprained her knee and wrist. (AR 43.) Yet,

20 the admittance sheet from St. Peter Hospital states that plaintiff "fell while running" and the

21 physician's notes state that plaintiff "fell in hole." (AR 706, 709.)

22       The ALJ also identified inconsistencies in plaintiff's activities as described in the CDIU

01 report. (AR 17-18.) For example, the ALJ appropriately considered that plaintiff was

02 observed wearing a nurse outfit and represented to Detective Monteer that she worked at the

03 Foot and Ankle Clinic. *See Smolen*, 80 F.3d at 1284 (ALJ may consider work record as factor

04 in discounting credibility). At the hearing, plaintiff denied working at the clinic (AR 42), and

05 in her declaration stated that she only went to the clinic to be near Ms. Southard, and spent her

06 time there watching movies in the employee lounge (AR 281). Yet, plaintiff detailed to

07 Detective Monteer the specific duties she performed at the clinic, such as answering phones,

08 filing, assisting with obtaining preliminary information from patients regarding their injuries,

09 and helping patients with sitting and standing. (AR 86.) Plaintiff also testified that her

10 memory is "not that good" (AR 58), but told Detective Monteer that she has a good memory,

11 while Ms. Southard told Detective Monteer that plaintiff has a "great memory" (AR 86).

12      The ALJ also appropriately pointed to plaintiff's testimony that her doctor told her she

13 would be taking prescription narcotics "forever." (AR 17, 43.) *See Tonapetyan*, 242 F.3d at

14 1148 (an ALJ appropriately considers inconsistency with the evidence and a tendency to

15 exaggerate in rejecting a claimant's testimony). The ALJ described plaintiff's statement as

16 "an incredulous opinion[]" (AR 17), and, although not necessarily indicative of narcotics

17 seeking behavior, accurately reflected that a physician wanted her to reduce her narcotics use

18 (*id.* (citing AR 402 (2003 treatment note showing that Dr. Keith Demirjian had a "lengthy

19 discussion" with plaintiff about tapering her off of Vicodin and placing more reliance on

20 Tylenol, heat, and swimming))).

21      Finally, the ALJ also appropriately considered that objective tests and findings within

22 the medical record did not support the severity of plaintiff's alleged symptoms. (AR 18.)

01  "While subjective pain testimony cannot be rejected on the sole ground that it is not fully

02  corroborated by objective medical evidence, the medical evidence is still a relevant factor in

03  determining the severity of claimant's pain and its disabling effects." *Rollins v. Massanari*,

04  261 F.3d 853, 857 (9th Cir. 2001).  Here, the ALJ noted that while plaintiff testified she was

05  limited to lifting a glass of water or a plate with her right hand, she was repeatedly found

06  capable of sedentary work activity, which is the ability to lift up to ten pounds maximum and

07  frequently lift and/or carry such articles as files and small tools.  (AR 18 (citing AR 138-50,

08  859-63).)

09      In sum, the ALJ provided clear and convincing reasons for finding plaintiff less than

10  fully credible.   The ALJ's credibility assessment should be upheld.

11                              Medical Opinions

12      In evaluating the weight to be given to the opinions of medical providers, Social

13  Security regulations distinguish between "acceptable medical sources" and "other sources."

14  Acceptable medical sources include, for example, licensed physicians and psychologists, while

15  other non-specified medical providers are considered "other sources."   20 C.F.R. §§

16  404.1513(a) and (e), 416.913(a) and (e), and Social Security Ruling (SSR) 06-03p.

17      In general, more weight should be given to the opinion of a treating physician than to a

18  non-treating physician, and more weight to the opinion of an examining physician than to a

19  non-examining physician.   *Lester*, 81 F.3d at 830.   Where not contradicted by another

20  physician, a treating or examining physician's opinion may be rejected only for "'clear and

21  convincing'" reasons.   *Id*. (quoting *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991)).

22  Where contradicted, a treating or examining physician's opinion may not be rejected without

01  "'specific and legitimate reasons' supported by substantial evidence in the record for so doing."

02  *Id.* at 830-31 (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)).

03  The ALJ may reject physicians' opinions "by setting out a detailed and thorough

04  summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and

05  making findings." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (citing *Magallanes*,

06  881 F.2d at 751).   Rather than merely stating his conclusions, the ALJ "must set forth his own

07  interpretations and explain why they, rather than the doctors', are correct." *Id.* (citing *Embrey*

08  *v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988)).

09  Less weight may be assigned to the opinions of other sources. *Gomez v. Chater*, 74

10  F.3d 967, 970 (9th Cir. 1996).   However, "[s]ince there is a requirement to consider all relevant

11  evidence in an individual's case record," the ALJ's decision "should reflect the consideration of

12  opinions from medical sources who are not 'acceptable medical sources' and from

13  'non-medical sources' who have seen the claimant in their professional capacity."   SSR

14  06-03p.   "[T]he adjudicator generally should explain the weight given to opinions from these

15  'other sources,' or otherwise ensure that the discussion of the evidence in the determination or

16  decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when

17  such opinions may have an effect on the outcome of the case." *Id.*

18  A.   Dr. Katherine Landy

19  Dr. Katherine Landy, as plaintiff's treating physician, and subsequently Certified

20  Physician Assistant (PA-C) Giang Vu, provided physical evaluations of plaintiff for DSHS

21  from 2006 to 2009.   The ALJ assessed the opinions of Dr. Landy and PA-C Vu as follows:

22  In 2007 and 2008, Katherine Z. Landy, M.D. noted the claimant's winged

01   scapula, cervical spine stenosis and wrist tendonitis resulted in limitations to
     sitting, standing, lifting, handling and carrying.  Dr. Landy also opined the
02   claimant['s] overall work level due to her physical medically determinable
     impairments was at the sedentary level.  However, with vocational
03   rehabilit[ation] Dr. Landy opined the claimant would improve employability.
     Giang Vu, PA-C also opined in 2009 the claimant was capable of sedentary level
04   work activity, which is the ability to lift up to 10 pounds maximum, frequently
     lift and/or carry such articles as files and small tools and may require sitting,
05   walking and standing for brief periods.   The undersigned accorded great weight
     to the opinions of Dr. Landy and PA-C Vu as they are consistent with the
06   evidence in record and are opinions from the claimant's treating providers.

07   (AR 21; internal citations omitted.)

08        Plaintiff argues that although the ALJ gave "great weight" to Dr. Landy's opinion, she

09   failed to account for this treating physician's finding of a restriction from work involving

10   "prolonged sitting."  (Dkt. 15 at 16.)  Plaintiff also argues the ALJ mischaracterized Dr.

11   Landy's assessment of the effect that vocational rehabilitation would have on plaintiff's

12   employability.  (*Id.*)

13        As the Commissioner argues, the ALJ's characterization of Dr. Landy's opinion

14   regarding vocational rehabilitation is irrelevant.   Dr. Landy noted that vocational rehabilitation

15   "was recommended" to improve plaintiff's employability.  (AR 846.)   The ALJ stated that it

16   was Dr. Landy's opinion that this rehabilitation "would" improve employability.  (AR 21.)

17   Regardless of whether the ALJ's interpretation was correct, on three separate occasions Dr.

18   Landy opined that plaintiff was currently capable of performing sedentary work, without any

19   further need for rehabilitation.   (AR 740, 746, 845.)   This was the opinion given weight by the

20   ALJ in assessing plaintiff's RFC.

21        However, the ALJ did not account for Dr. Landy's opinion as to a limitation on

22   plaintiff's ability to sit for long periods of time.  Dr. Landy noted a marked limitation in

01 plaintiff's ability to sit due to cervical spine stenosis in July 2006, June 2007, and June 2008.

02 (*Id.*)  PA-C Vu also opined that plaintiff had a marked limitation with sitting when he

03 evaluated her in May 2009.  (AR 861.)    While Dr. Landy nonetheless assessed plaintiff as

04 capable of sedentary work, she also noted that plaintiff experiences numbness from prolonged

05 sitting and, on one occasion, specifically opined that she is "unable to sit for long periods of

06 time."[2]  (AR 747, 847.)

07        The only medical evidence contradicting Dr. Landy's opinion comes from reviewing

08 State agency consultant Debra Stocker, whose opinion appears to have been affirmed by Dr.

09 Wayne Hurley.[3]  (AR 788, 837.)   She opined in December 2007 that plaintiff was capable of

10 sitting with normal breaks for a total of about six hours in an eight hour workday.  (AR 788.)

11 The ALJ acknowledged this report and found it deserved weight.  (AR 18.)  However, the

12 opinion of a non-examining physician cannot by itself constitute substantial evidence that

13 _____

14        [2] Plaintiff also argues that the definition of sedentary work on the DSHS forms completed by
Dr. Landy and Vu are not consistent with the sitting requirements for sedentary work.  (*Compare* AR

15 740 ("A sedentary job may require sitting, walking, and standing for brief periods."), *with* 20 C.F.R. §§
404.1567(a), 416.967(a) ("Although a sedentary job is defined as one which involves sitting, a certain

16 amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if
walking and standing are required occasionally and other sedentary criteria are met. ")); s*ee also*

17 *Vertigan*, 260 F.3d at 1052 ("In a work environment requiring sedentary work, the Social Security Rules
require necessary sitting as the ability to do such for six to eight hours a day.") (citing SSR 83-10).

18 However, the Court concludes this argument does not have merit.  The DSHS form definition does not
necessarily preclude the need for prolonged sitting.  Indeed, it is unclear what jobs would qualify as

19 sedentary if individuals could only sit, walk, *and* stand for brief periods.  As reflected in the Social
Security regulations, sedentary work necessarily requires limited walking and standing, and, therefore,
greater periods of sitting.

20        [3] It is not entirely clear whether Dr. Hurley reviewed Debra Stocker's physical evaluation from
December 12, 2007, or Dr. Postvoit's mental evaluation from December 12, 2007.  Dr. Hurley states "I

21 [have] reviewed all evidence on file and the assessment of 12/12/2007 is affirmed as written."  (AR
837.)  Regardless of which evaluation he affirmed, the analysis of plaintiff's physical and mental

22 limitations remains the same.

01  justifies the rejection of the opinion of a treating physician.  *Lester*, 81 F.3d at 831 (citing

02  *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990) and *Gallant v. Heckler,* 753 F.2d 1450,

03  1456 (9th Cir. 1984)).   Moreover, the ALJ did not specifically address the finding as affirmed

04  by Dr. Hurley, or in any respect acknowledge or discuss Dr. Landy's assessment of a limitation

05  on prolonged sitting.   The ALJ should, on remand, reassess the evidence from Dr. Landy as

06  related to a limitation on plaintiff's ability to sit for prolonged periods.[4]

07  B.    Dr. Esparza

08        Dr. Brian Esparza performed a mental examination of plaintiff for Disability

09  Determination Services in April 2006.   The ALJ assessed Dr. Esparza's opinions as follows:

10          [C]onsultative examiner Brian Esparza, M.D. opined in August 2006 the
            claimant demonstrated several strengths which included clear orientation.   The
11          claimant was able to recall past information and scored 3/3 in digit recall both
            forward and backward.   The claimant also reported she was cleaning the home
12          regularly and compulsively while taking care of animals.   She also expressed
            her ability to prepare her own meals.   Due to educational constraints, Dr.
13          Esparza opined the claimant had difficulty recalling serial seven's.   Yet, she
            was able to spell *world* forward and backward and follow a three step command
14          without difficulty.   Dr. Esparza opined the claimant demonstrated consistent
            employment in the past and it translated to "real world employability."   He
15          ruled out a psychotic and bipolar disorder.   However, he did conclude
            employment difficulties were due to depression, panic disorder and
16          post-traumatic stress disorder.   He also opined in 2006 the claimant was unable
            to attend work on a regular and consistent basis.   The undersigned considered
17          the opinion of Dr. Esparza and accorded him some weight because certain
            aspects of Dr. Esparza's opinion are in fact consistent with the current residual
18          functional capacity determined in this decision (i.e., the claimant had difficulty
            with interpersonal interactions today.)   However, his opinion is not supported
19          by objective testing and appeared to be influenced by the self reports of the
            claimant which Dr. Esparza confined to that specific period of time with no

20

21          [4] The Court notes that, pursuant to SSR 83-12: "Unskilled types of jobs are particularly
        structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability
22      to sit or stand, a [VE] should be consulted to clarify the implications for the occupational base."

01    concrete conclusion the claimant was precluded from work activities in the
      future (i.e. "…good prognostic fact for the future.")
02

03    (AR 18-19; internal citations omitted.)

04        Plaintiff appeared, in her opening brief, to take issue with the ALJ's decision to afford

05    limited weight to Dr. Esparza's opinions.  (*See* Dkt. 15 at 15.)  However, plaintiff merely

06    recited the ALJ's reasoning for affording Dr. Esparza's opinions limited weight and did not

07    write even one sentence describing how the ALJ erred in his evaluation.[5]  Respondent noted

08    plaintiff's apparent failure to allege any error and plaintiff, in her reply, did not refute this

09    assertion or otherwise address any issues in relation to the opinions of Dr. Esparza.

10    Accordingly, the Court considers this claim to be forfeited.  *See Independent Towers of Wash.*

11    *v. Wash.*, 350 F.3d 925, 929 (9th Cir. 2003) (court will not consider any claims that were not

12    specifically and distinctly argued in a party's opening brief); s*ee also Vandenboom v. Barnhart*,

13    421 F.3d 745, 750 (8th Cir. 2005) (rejecting out of hand conclusory assertion that ALJ failed to

14    consider whether claimant met listings because claimant provided no analysis of relevant law or

15    facts regarding listings); *Perez v. Barnhart*, 415 F.3d 457, 462 n. 4 (5th Cir. 2005) (argument

16    waived by inadequate briefing).  It is not enough merely to present an argument in the

17    skimpiest way, and leave the Court to do counsel's work—framing the argument and putting

18    flesh on its bones through a discussion of the applicable law and facts.  *See*, *e.g.*, *Murrell v.*

19    *Shalala*, 43 F.3d 1388, 1389 n. 2 (10th Cir. 1994) (perfunctory statements fail to frame and

20    develop issue sufficiently to invoke appellate review).

21    _____
          [5] Plaintiff did take issue with a finding relating to Dr. Esparza in arguing the ALJ failed to
22    develop the record.  (Dkt. 15 at 20.)  That specific argument is addressed separately below.

01  C.      DSHS Evaluators

02          Plaintiff also challenges the ALJ's decision to give limited weight to the opinions of

03  DSHS evaluators.   The Court notes that the DSHS evaluators are not acceptable medical

04  sources per 20 C.F.R. § 404.1513 and, therefore, constitute other sources.   *See Turner v.*

05  *Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223-24 (9th Cir. 2010) (lay testimony from other sources

06  may be expressly disregarded if the ALJ gives germane reasons for doing so).   One mental

07  status reassessment form completed by Dawn Stremel also contained the signature of a licensed

08  psychologist.   However, as discussed below, this report supports the ALJ's findings.   (AR

09  756-59.)

10          The ALJ assessed the opinions of the DSHS evaluators as follows:

11      The record evidence also contained subsequent DSHS psychological
        evaluations by Kimberly Cole, MA, MHP, (2006) Dawn Stremel, MA, MHP
12      (2007), Michael T. Werner, MSW, MHP (2008) and Kimberly M. Johnson, MA,
        MHP (2009).   They reflect opinions that the claimant's access to mental health
13      treatment would restore or substantially improve the claimant's ability to work
        for pay in a regular and predictable manner in 2006, 2007 and 2009.   In 2008,
14      Mr. Werner reported due to the "client's concurrent medical problems" it was
        "doubtful" mental health treatment would improve her ability to work.   In 2006
15      Kimberly Cole, MA, MHP opined without objective testing the claimant had a
        marked severity in her ability to understand, remember and follow more than
16      two step instructions; in her ability to relate appropriately with co-workers and
        supervisors; and in her ability to care for herself, including personal hygiene and
17      appearance. Ms. Cole also opined the claimant had a severe limitation in her
        ability to interact appropriately in public contacts.   In 2007 and 2008, the
18      "marked" and "severe" limitations were variations of those described by the
        other DSHS evaluators and also based on the claimant reports.   By 2009, Ms.
19      Johnson rendered an opinion based upon "subjective report and objective
        observation through ongoing therapy..." the claimant had no "severe"
20      limitations; but, had "marked" limitations in her ability to relate to co-workers
        and supervisors; in her ability to interact appropriately in public contacts; and, in
21      her ability to control physical or motor movements and maintain appropriate
        behavior.   Generally as DSHS examiners, they do not constitute treating
22      sources and the weight accorded to their opinions regarding the claimant's

01  ability to work is limited by the fact they base their conclusions solely upon a
    one-time conclusory evaluations (sic) and/or mental status exam. The weight
02  that can be accorded to the opinions of the DSHS evaluators is further limited by
    the significant reliance they appeared to have placed upon the subjective
03  allegations of an individual with documented credibility issues and secondary
    gain motivation for entitlement to state general assistance benefits.

04
    However, there is a possibility a therapist may express an opinion in an effort to
05  assist a patient with whom he or she sympathizes for one reason or another.
    While it is difficult to confirm the presence of said motives, they are more likely
06  in situations where the opinion in question departs substantially from the rest of
    the evidence in the record, as in the current case. For example, in the
07  examination from Greater Lakes Mental Health in June 2007, Ms. Stremel and
    her supervisor, Pam Sarlund-Heinrick, Psy.D. opined the claimant had a GAF of
08  51 and her judgment was "fair;" the claimant was "appropriately social" and that
    she had "minor difficulty" with short and long term memory. Yet, in the DSHS
09  evaluation dated June 7, 2007, Ms. Stremel noted the claimant had a "marked"
    severity with exercising judgment, "marked" severity in her ability to relate
10  appropriately, which conflict with the Greater Lakes assessment. At a
    minimum, it calls to question the level of sympathy, and objectivity for that
11  matter, a therapist has with respect to seeing their (sic) patients acquire general
    assistance benefits and continue treatment with the therapist. Irrespective of
12  the motivation, the reliability of the DSHS evaluation opinions are accorded less
    weight [due] to many factors discussed herein.

13

14  (AR 19-20; internal citations omitted.)

15      Plaintiff notes the ALJ's finding that the DSHS evaluators based their opinions upon

16  single examinations and relied on plaintiff's subjective complaints. (*See* Dkt. 15 at 15.)

17  However, as with Dr. Landy, plaintiff does not identify or discuss any error in these findings.

18  (*Id.*)

19      Plaintiff does specifically argue that it is improper for an ALJ to assume that doctors, or,

20  as in this case, therapists, lie in order to help their clients obtain benefits in the absence of

21  evidence of actual impropriety. *Lester*, 81 F.3d at 832. She also denies any discrepancy in

22  the two evaluation forms completed by Ms. Stremel, stating they were prepared for different

01  reasons requiring different levels of specificity.

02      As conceded by the Commissioner, the ALJ's speculation as to the DSHS evaluators'

03  motivation was extraneous. (AR 20 (the ALJ clarified that "[i]rrespective of the motivation,

04  the reliability of the DSHS evaluation opinions are accorded less weight [due] to many factors

05  discussed herein.")) The ALJ correctly notes discrepancies between the June 7, 2007 internal

06  reassessment completed by Ms. Stremel and her supervisor and the June 7, 2007 DSHS

07  evaluation completed by Ms. Stremel. Ms. Stremel opined in the reassessment that plaintiff's

08  appearance, thought process, orientation, behavior, speech, and energy were all appropriate.

09  (AR 756-57.) In addition, she opined that plaintiff was appropriately social and had fair

10  judgment and insight, and a Global Assessment of Functioning (GAF) score of 51.[6] Yet, on

11  the DSHS form, Ms. Stremel opined that plaintiff was markedly limited in exercising judgment

12  and making decisions; relating appropriately to co-workers and supervisors; interacting

13  appropriately with public contacts; and responding appropriately to and tolerating the pressure

14  and expectations of a normal work setting. (AR 752.) Accordingly, the ALJ appropriately

15  considered discrepancies between the two reports. *See Bayliss*, 427 F.3d at 1216

16  (discrepancies between doctor's notes and opinions is a clear and convincing reason for not

17  relying on the doctor's opinion).

18      The ALJ also found that the evaluators' opinions departed substantially from the rest of

19  the evidence in the record. Inconsistency with medical evidence is a germane reason for

20

21      [6] A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial
    speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning
22  (e.g., few friends, conflicts with peers or co-workers)." Diagnostic and Statistical Manual of Mental
    Disorders 34 (4th ed. 2000) (DSM-IV-TR).

01  discrediting lay testimony. *Bayliss*, 427 F.3d at 1218. As discussed below, the ALJ properly

02  relied on the medical opinions of the reviewing State agency physicians which contradicted the

03  opinions of the DSHS evaluators. (AR 18, 600, 704-05, 795, 836.) The ALJ is responsible

04  for resolving conflicts in the medical record, *Carmickle*, 533 F.3d at 1164, and when evidence

05  reasonably supports either confirming or reversing the ALJ's decision, we may not substitute

06  our judgment for that of the ALJ, *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

07  Here, the fact that the DSHS evaluators' opinions were contradicted by other opinions from

08  acceptable medical sources provided a germane reason for the ALJ to discount their opinions.

09  *See Gomez*, 74 F.3d at 970 (less weight may be assigned to the opinions from other sources than

10  from acceptable medical sources). In addition, as discussed above, the ALJ also appropriately

11  took into consideration contradictory evidence from the CDIU report as to plaintiff's activities.

12  *See Carmickle*, 533 F.3d at 1164 (contradictory evidence of plaintiff's activities supported

13  ALJ's rejection of lay testimony as to symptoms).

14       Finally, the ALJ also concluded that the DSHS evaluators appeared to rely significantly

15  on the subjective allegations of an individual with documented credibility issues. While there

16  appears to have been other evidence relied upon (*see* AR 632, 634-45, 734-55, 856), the

17  evaluation forms do reflect significant echoing of statements made by plaintiff (*see, e.g.*, AR

18  752, 755, 840). The ALJ's conclusion that evaluators relied on plaintiff's subjective

19  complaints can, therefore, be deemed a rational interpretation of the evidence. For this reason,

20  and for the reasons described above, plaintiff fails to demonstrate error in the ALJ's

21  consideration of the DSHS evaluators' opinions.

22  / / /

01 D.      Reviewing State Agency Physicians

02      Plaintiff also argues that the ALJ improperly credited the opinions of reviewing State

03 agency physicians.   The ALJ assessed those opinions as follows:

> The residual functional capacity conclusions reached by the physicians
> employed by the State disability determination services also support a finding of
> 'not disabled.'   Although these physicians were non-examining and therefore
> their opinions do not as a general matter deserve as much weight as those of
> examining or treating physicians, those opinions do deserve some weight,
> particularly in a case like this in which there exist a number of other reasons to
> reach similar conclusions, as explained throughout this decision.

08 (AR 18; internal citations omitted.)

09      Plaintiff argues that the Mental Residual Functional Capacity Assessment (MRFCA)

10 completed by Dr. Michael Regets prior to the CDIU investigation, and later affirmed by Drs.

11 Thomas Clifford and Alfred Dickson, conflicts with assessments completed after the

12 investigation.   Dr. Regets opined in May 2006 that plaintiff had various moderate limitations.

13 (*See* AR 598-601.)   In a subsequent evaluation completed by Dr. Leslie Postvoit in December

14 2007, and later affirmed by Dr. Carla van Dam, plaintiff was found to have only a mild

15 limitation in maintaining social functioning and no other limitations caused by mental

16 impairment.[7]   (AR 805, 836.)   Plaintiff argues that the ALJ made no effort to reconcile these

17 conflicts aside from reliance on the CDIU report.

18      As discussed above, it was proper for the ALJ to consider the CDIU report as evidence.

19 Likewise, as argued by the Commissioner, the State agency physicians appropriately

20

21 ───────────────
         [7] As discussed in footnote 3, it is unclear whether Dr. Hurley affirmed Debra Stocker's physical
22 evaluation or Dr. Postvoit's mental evaluation.

01  considered the CDIU report as new and material evidence to consider in their evaluations.[8]

02  Further, the ALJ's failure to discuss discrepancies between the medical opinions issued

03  before and after the CDIU report can be deemed harmless. In fact, although Drs. Regets,

04  Clifford, and Dickson opined that plaintiff had various moderate limitations, the conclusions in

05  the evaluation nonetheless comport with the ALJ's RFC assessment. (*See* AR 598-601.) In

06  the narrative portion of the MRFCA form, Dr. Regets concluded that plaintiff can perform some

07  "complex tasks;" "has sustained regular work in the past;" "can interact w[ith] a few coworkers

08  that she is comfortable w[ith] and a supervisor;" "should not interact w[ith] the public on a

09  more than superficial basis;" "is capable of adaptation in the work place;" and "is functioning in

10  a manner that would allow her to participate in work like activity."[9] (AR 600.) The Court

11  concludes that the limitation of working with things not people adequately addressed the

12  limitations assessed by these physicians. Furthermore, as plaintiff points out in her briefing,

13  the ALJ is not required to discuss all evidence presented and must only explain the rejection of

14  significant probative evidence. *Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984).

15  Here, the ALJ cited to the opinions of all of the non-examining physicians in concluding that

---

16  

17      8 Although not specifically argued by plaintiff, the Court notes that Dr. Postvoit relied on hearsay statements from plaintiff's trailer park manager in concluding that plaintiff was abusing narcotics. As discussed earlier, substantial evidence does not support a finding that plaintiff engaged in

18  drug seeking behavior. However, Dr. Postvoit also stated that the overuse of narcotics "[does] not appear to impact her functioning." (AR 807.) Whatever error may have occurred, therefore, is harmless, as it does not appear that Dr. Postvoit's opinions regarding plaintiff's functioning were

19  influenced by the possibility of substance abuse.

20      9 "The purpose of section I . . . on the [MRFCA] is chiefly to have a worksheet to ensure that the psychiatrist or psychologist has considered each of these pertinent mental activities and the claimant's

21  or beneficiary's degree of limitation for sustaining these activities over a normal workday and workweek on an ongoing, appropriate, and independent basis. It is the narrative written by the

22  psychiatrist or psychologist in section III . . . of [the MRFCA] that adjudicators are to use as the assessment of RFC." Program Operations Manual System (POMS) DI 25020.010 at B.1.

01 they supported a finding of "not disabled." (AR 18.)

02 <u>Lay Testimony</u>

03     Lay witness testimony as to a claimant's symptoms or how an impairment affects ability

04 to work is competent evidence. *Van Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996).

05 The ALJ can reject the testimony of lay witnesses only upon giving reasons germane to each

06 witness. *See Smolen*, 80 F.3d at 1288-89 (finding rejection of testimony of family members

07 because, *inter alia*, they were "understandably advocates, and biased" amounted to "wholesale

08 dismissal of the testimony of all the witnesses as a group and therefore [did] not qualify as a

09 reason germane to each individual who testified.") (citing *Dodrill v. Shalala*, 12 F.3d 915, 918

10 (9th Cir. 1993)). *Accord Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) ("[L]ay testimony

11 as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless

12 he or she expressly determines to disregard such testimony and gives reasons germane to each

13 witness for doing so."). "[W]here the ALJ's error lies in a failure to properly discuss

14 competent lay testimony favorable to the claimant, a reviewing court cannot consider the error

15 harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the

16 testimony, could have reached a different disability determination." *Stout v. Comm'r of Soc.*

17 *Sec. Admin.*, 454 F.3d 1050, 1056 (9th Cir. 2006).

18     Plaintiff argues that the ALJ erred in limiting the weight given to Ms. Southard's lay

19 opinions. The ALJ considered the lay testimony of Ms. Southard as follows:

20     The undersigned considered evidence, such as the testimony of the claimant's
    significant other, Kristin[e] Southard and considered this evidence as a
21     non-medical source, and had not seen the claimant in a professional capacity in
    connection with her impairments. The undersigned considered factors such as
22     the nature and extent of the relationship between the claimant and the

non-medical source; whether the evidence is consistent with other evidence; and, other factors that tend to support or refuse (sic) the source statements. The undersigned afforded some weight to the opinion of Ms. Southard due to her long-term relationship and personal observations of the claimant in the current residual functional capacity. However, her information may have an indicia of unreliability because her report is based upon the claimant's self-reported symptoms and not based upon medical facts or diagnostic testing. Furthermore, Ms. Southard has a financial interest in the outcome of this case as they have shared a home and finances for over 15 years. . . . Both Ms. Southard and Mr. Schmidt describe the claimant's withdraw[al] from social interaction and it was considered in the current residual functional capacity.

(AR 17; internal citations to the record omitted.)

Plaintiff asserts that the lay testimony was consistent with her testimony, as well as the opinions of Dr. Esparza and the DSHS evaluators. Plaintiff argues that lay testimony is not required to be supported by medical testing, *Smolen*, 80 F.3d at 1289, and avers that Ms. Southard's testimony was based on her personal observations of plaintiff and not on plaintiff's self-reported symptoms, *see Dodrill*, 12 F.3d at 918-19. Finally, plaintiff argues that it was legal error for the ALJ to reject Ms. Southard's testimony because she may be an "interested party." *See Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009) (citing *Dodrill*, 12 F.3d at 918-19).

The Commissioner concedes that Ms. Southard based her testimony on direct observation, rather than upon plaintiff's subjective reports, as well as that her testimony did not require medical confirmation. He additionally agrees that an ALJ may not discredit a lay witness because she is an interested party, while noting dicta in *Valentine* stating "evidence that a specific spouse exaggerated a claimant's symptoms *in order* to get access to [plaintiff's] disability benefits, as opposed to being an 'interested party' in the abstract, might suffice to reject that spouse's testimony." *Id.* (emphasis in original).

01    The Commissioner argues, however, that any of the purported errors in the analysis are

02    harmless given that the ALJ properly considered and weighed the overall record in giving only

03    some weight to Ms. Southard's testimony.   He points, in particular, to inconsistencies between

04    plaintiff's activities and Ms. Southard's testimony that plaintiff mostly stayed home and could

05    not do anything.   *See Carmickle*, 533 F.3d at 1164 (contradictory evidence of plaintiff's

06    activities supported ALJ's rejection of lay testimony as to symptoms).   The Commissioner

07    also points to the contradictory medical evidence as a germane reason for discrediting this lay

08    testimony.   *Bayliss*, 427 F.3d at 1218.

09    In the paragraph following her discussion of the lay witness testimony, and as reflected

10    in the excerpt above, the ALJ specifically discussed Ms. Southard in the context of the CDIU

11    report.   A reasonable inference can be drawn that the ALJ relied on inconsistencies between

12    Ms. Southard's testimony and her statements and the findings in the CDIU report as a germane

13    reason for limiting the weight afforded her testimony.   *See Magallanes*, 881 F.2d at 755 ("As a

14    reviewing court, we are not deprived of our faculties for drawing specific and legitimate

15    inferences from the ALJ's opinion.").   The CDIU discussion further supports the conclusion

16    that Ms. Southard has a more than abstract financial interest in the outcome of this case.   Ms.

17    Southard testified that she and plaintiff have been living together for about sixteen years.   (AR

18    72.)   She also testified that plaintiff remains at home while she goes to work, and that plaintiff

19    spends her days either in bed or on the couch laying around and watching television.   (AR 74.)

20    Yet, the CDIU report indicates that plaintiff worked at the Foot and Ankle Clinic, and exhibited

21    no physical difficulties or limitations while being observed by investigators.   (AR 86.)   Ms.

22    Southard also testified that plaintiff does not read instructions well, cannot remember how to

01 open a computer game even though she has been shown how to do so many times, and does not

02 open the mail because she would not understand it.  (AR 77.)  Conversely, Ms. Southard told

03 CDIU investigators that plaintiff has a "great memory[,]" while the investigators reported

04 plaintiff "was pleasant and cooperative and was able to follow the conversation and respond

05 without any hesitation."  (AR 86-87.)  Taken together, the inconsistencies between Ms.

06 Southard's testimony and the CDIU report arguably provides evidence that Ms. Southard

07 exaggerated plaintiff's symptoms in order to gain access to plaintiff's disability benefits.

08        On the other hand, the ALJ did not, in addressing the lay testimony, explicitly state that

09 Ms. Southard's testimony was contradicted by the CDIU report or other evidence of plaintiff's

10 activities.   Nor did the ALJ point to inconsistencies with the medical record or the record as a

11 whole.   Instead, she appeared to improperly assume that the lay testimony was based on

12 plaintiff's self reports and relied on an absence of corroborating medical support.     Therefore,

13 on remand, the ALJ should provide a more detailed assessment of Ms. Southard's lay

14 testimony.

15                              ALJ's Duty to Develop the Record

16        Plaintiff argues that evidence of her mental impairments was ambiguous, and the ALJ

17 erred in not developing the record further.  *See Tonapetyan*, 242 F.3d at 1150 ("The ALJ in a

18 social security case has an independent duty to fully and fairly develop the record and to assure

19 that the claimant's interests are considered.") (internal quotation marks and quoted sources

20 omitted) and *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001) ("An ALJ's duty to

21 develop the record further is triggered only when there is ambiguous evidence or when the

22 record is inadequate to allow for proper evaluation of the evidence.").   She points to the limited

01 weight assigned to evaluations of her mental impairments based on the absence of objective

02 testing.  (*See* Dkt. 15 at 20 (citing AR 19).)   Plaintiff avers that there was no reason for her

03 counselors to conduct testing and that it was not her fault Dr. Esparza failed to perform testing.

04 Noting that the ALJ gave her "the benefit of the doubt" in assessing limitations in the RFC (AR

05 21), plaintiff argues that, if there was some ambiguity testing would have helped resolve, the

06 ALJ had a duty to develop the record and request another consultative examination.

07 As noted by the Commissioner, however, Dr. Esparza did perform a mental status

08 evaluation.   The ALJ recounted the results of that evaluation, including plaintiff's clear

09 orientation and successful recall and concentration abilities.  (AR 18-19, 580-83.)   She

10 thereafter concluded that Dr. Esparza's opinions were "not supported by objective testing[.]"

11 (AR 19.)   This finding could, therefore, be rationally read to mean that the ALJ concluded Dr.

12 Esparza's own testing results did not support his opinions as to plaintiff's limitations.

13 In any event, even reading the decision to imply that the ALJ concluded Dr. Esparza and

14 other mental health evaluators failed to support their opinions with *any* objective testing,

15 plaintiff fails to demonstrate error.   The ALJ provided several reasons for affording only some

16 weight to Dr. Esparza's opinions, including a lack of support by objective testing, the apparent

17 influence of plaintiff's self-reports, and indications that Dr. Esparza did not proffer a "concrete

18 conclusion that claimant was precluded from work activities in the future (i.e. ". . . good

19 prognostic fact for the future.")  (AR 19.)   He likewise, as explained above, provided

20 sufficient reasons for affording limited weight to the opinions of the DSHS evaluators.

21 The ALJ made no finding that the evidence was ambiguous or that the record was

22 inadequate to allow for proper evaluation.   Nor did any of the medical evaluators find that

01 evidence of plaintiff's alleged impairments was ambiguous. *See Tonapetyan*, 242 F.3d at

02 1150 (ALJ "was not free to ignore Dr. Walter's specific recommendation that a more detailed

03 report from Dr. Trabulus be obtained"). As discussed above, the ALJ's findings regarding

04 plaintiff's mental impairments were supported by medical opinions from the reviewing

05 physicians, the CDIU report, and other evidence of plaintiff's activities. The evidence was

06 conflicting, but not ambiguous. For these reasons, plaintiff fails to support the contention that

07 the ALJ erred in failing to develop the record further.

08 <u>**CONCLUSION**</u>

09 For the reasons set forth above, this matter should be REMANDED for further

10 administrative proceedings.

11 DATED this <u>28th</u> day of July, 2011.

12

13 _____
Mary Alice Theiler
14 United States Magistrate Judge

15

16

17

18

19

20

21

22